Good morning. Good morning, Your Honors. My name is Jessica Miller, and may it please the Court, I represent Plaintiff Jose Valtierra, who is appealing the Arizona District Court's order granting summary judgment against his disability claims. I intend to reserve three minutes for rebuttal, and I am yielding five minutes to the Equal Employment Opportunity Commission, which leaves me with seven minutes. So I will get right to it. The argument is that— What are you going to do on rebuttal time? I'm sorry, three minutes, sir. Three minutes, okay. You're going to get that, or both of you? Just me. Okay, great. Thank you. Morbid obesity standing alone is an impairment under the Americans with Disabilities Act without the additional element of proof that a separate physiological disorder causes the morbid obesity. As you know, several circuits have said the opposite. That's correct, sir. Why should we create a circuit conflict by ruling differently? If you start from scratch, this — well, and I'll start with the Sixth Circuit. So it starts with the Sixth Circuit decision in Watkins. May I interrupt and forgive me, but why do we even reach this issue if the district court correctly determined that the plaintiff was terminated for falsifying business records? You don't. I don't believe that the district court completed a pretext analysis because we didn't pass the threshold of first proving that the client or that the plaintiff was disabled. So we didn't get to reach the pretext analysis down at the district court, which would be a legitimate reason to grant summary judgment, and it's very often where plaintiffs lose summary judgment in cases like this. But the court determined that Mr. Valtiero was not disabled. Well, there's no dispute that he falsified business records, right? He admitted to that. We would term it in a different way, Your Honor, but yes, that's correct. And there's no dispute that, at least on its face, that was the reason he was terminated. That's not exactly true. So in the McDonnell-Douglas burden-shifting structure, we can concede that the defendant in the court below satisfied its obligation to identify a legitimate nondiscriminatory justification for terminating Mr. Valtiero. No, I understand, and you can show pretext and all like that, but I'm just trying to to what would be your what would be your showing of pretext? What would be your evidentiary showing of pretext? There's ample evidence of pretext here, Your Honor. So the reason why my client was terminated is because he prematurely signed off on preventative maintenance that he hadn't actually completed, which at a superficial level seems like a legitimate reason, which is why it's Medtronic's reason for discharging Mr. Valtiero in the first place. However, when you take a look at what the rest of the entire staff of facilities maintenance crew are doing, they're doing the exact same thing with the knowledge of the supervisor, that very same supervisor that terminated Valtiero for that for that conduct. Are you saying that people routinely falsified their records to show that they'd done things that they hadn't? I think to say routinely would be a bit of an exaggeration. Some isolated instances. I think that one of the one of the individuals, one of Mr. Valtiero's similarly situated peers testified that it happened approximately two to three times a year, and that the supervisor would assist him, the supervisor would sign off on the preventative maintenance tasks as having been completed, and then say, hey, go complete these before they become past due, or go complete those because I've already signed off on them. So because this isn't a scenario where you have the peers engaging in identical misconduct without the knowledge of the supervisor, you have the supervisor complicit in assisting the maintenance the maintenance crew in engaging in the exact same conduct that Mr. Valtiero engaged in. However, it was not a terminal a terminable offense when his similarly situated peers engaged in that misconduct, and in fact, they weren't even disciplined. However, Mr. Valtiero, even though he worked for Medtronic for ten years with favorable job reviews, raises, promotions, and no previous disciplinary action was immediately terminated for it. And that all occurred during this time frame when Mr. Valtiero's supervisor notices that Mr. Valtiero's weight has fluctuated, has increased. But that had occurred over a ten-year period, right? No, it was. During the entire time he was there? No, this was just towards right preceding the end of his discharge. You're saying that he was svelte all the rest of the time and then he became huge? No, no. I thought he was big all along. I'm not trying to be offensive to him, but I'm just saying I thought he was kind of obese during his entire employment period. Is that wrong? He was. That's correct. Okay, so you have this supervisor who's known that all along. This is not a surprise. And at least as I understand it, your client indicated that the supervisor on several other occasions had, at his request, not assigned him to do certain things because he thought it was difficult because of his weight going up ladders and so on. Is that wrong? That's correct, actually. And that supervisor was well aware of Mr. Valtierra's morbid obesity before the time frame where he begins documenting that he notices that Mr. Valtierra is walking slower. He documents this. This is all written in an email. He notices Mr. Valtierra walking slower. He notices that he's using the cart instead of walking across the campus. And he attributes it to Mr. Valtierra's weight and so then decides to take away the accommodations that he had previously extended to Mr. Valtierra. And it wasn't formal. He just said, okay, you don't have to do the ladder. At least as I understand it, in this case, unlike most, you don't have a formal request for accommodation, right? Correct. At any time? No, sir, not a formal request for accommodation. Okay, so basically you've got the supervisor being, in quotes, a nice guy, helping out and so on. But in this occasion, he was not a nice guy. He gave me his assignments and Mr. Valtierra falsified the records, admittedly so. Isn't that a problem? It would be a problem if the analysis stopped at the employer's obligation to identify a legitimate non-discriminatory reason. However, we've identified reasons in the record that are not based on conclusion or guesses. We have actual peers and employees that are doing the exact same thing with knowledge of the supervisor that aren't even being reprimanded for it. That are morbidly obese? No. We're talking, in this case, about morbid obesity, right? Yes, sir. So I guess my concern is if he makes an accommodation request and says, look, I can't do this. I need you to assign me to something else. Then we've got one kind of a deal. I'm concerned about, if you will, an implied accommodation. Is there any case law that you can refer me to that suggests that based on past conduct that there's kind of a floating implied accommodation request that hangs out there? So, Your Honor, and I'll make this quickly because I'm running out of my time. Okay. There's no — the claim isn't a failure-to-accommodate claim. I don't believe that that's been alleged. The lack of accommodation or the revocation of that accommodation and then assigning these job tasks that my client could not perform without severe pain was meant to establish discriminatory animus. You shouldn't be jerking around an employee who's morbidly obese just to see the outer limits of the way that they can function in the workplace. And with that — Okay, that's fine. Go ahead. Thanks. Who are we hearing from? Yeah, we're going to hear from the EEOC. Good morning. Thank you, Your Honor. Good morning. Okay, I've been looking for — go ahead and introduce yourself. Barbara Sloan for the EEOC. So you've been looking for — Yeah, I've been looking forward to hearing from you because, if I understand it, four circuits have gotten your guideline wrong? That's correct, Your Honor, although some are wronger than others. Okay, go ahead. The First Circuit got it right, except we don't have the guideline there. The Second Circuit acknowledged that morbid obesity might, in fact, be a disability or an impairment in any event. It's only when we got to Watson, Morris, and now Richardson that they've made the mistake because, in fact — Okay, go — so how could this happen? Well, Richardson is a federal — I mean, is a public sector case. We weren't able to participate, so we did not file a brief there. And I'm not sure how that — how it happened otherwise because our reading of the guidance — first of all, our regulation, obesity clearly fits into the regulation very neatly. It doesn't — it just says a physiological disorder or condition that affects the body system. Well, clearly obesity does that. And our guidance says — tells you what an impairment is not. It's not a — it's not a condition like weight, for example, that's within the normal range and not the result of a physiological impairment. That is not — of a disorder. That is not an impairment. So that leaves us with what is an impairment. And, well, what may be an impairment because all we know from the guidance is what isn't. And the — what isn't — I mean, what is an impairment or what may be an impairment is weight or height that's outside the normal range or the result of a physiological impairment. That's the way the guidance reads. And it makes sense. It's a — it's not a per se rule. The defendant says it's a per se rule. It's not. Of course, there's a range of conditions. If a person has a BMI, for example, of 26, it's a jury question. Would the jury find that's an impairment? Probably not. But the higher it goes, the more outside you are, the likelier it is that a jury is going to find that to be an impairment, as happened in Cook. Or going the opposite way, the smaller you get, the likelier you are that the jury is going to find that you have an impairment, that you're — you know, a dwarf, for example, may well have an impairment. And, of course — So it's literally decided on a case-by-case basis? Yes. And you know what? That is not a problem because a lot of things are on the sliding scale. For example, someone has high blood pressure, and it may be a little high or it may be very high. And people manage with that. That's not a problem. But it's not — remembering that it's not a disability just because it's an impairment. It's — to be a disability, it's a two-part thing. You've got to have an impairment and a substantial limitation of a major life activity. And you're only at step one if you find that there's an impairment. Now, the BNSF suggests that that's really unfair to employers because this is a statute that provides reasonable accommodation. But it doesn't apply. It doesn't provide reasonable accommodation solely on the basis of impairment. Even a regarded-as condition, if that's the coverage basis, there's no reasonable accommodation requirement. So if you're — as the jury could have found in Cook, if you're an employer who got reaction and says, no, I'm not going to hire you because of your weight, because I think you're obese, then that would be a — could be regarded as disability. But there'd be no reasonable accommodation requirement. You have to be able to do the essential functions. Yeah. So it's really not unfair. It's the better reading of the way we wrote the — So where — so what — so if the weight is outside the normal range — Right. — then there is — you're saying there is no requirement that there be a physiological impairment? There is no requirement that there be — it's an or. It could be outside the normal range, or there could be a physiological impairment. Let's say a person has, in fact, morbid obesity, and it's documented why it's happening, which, of course, in many cases, there's no known cause for things. Then maybe Herculean efforts, they keep their weight down, but they still have an underlying impairment — I mean, an underlying physiological disorder. So it's a possibility. I — And where the courts have gone wrong is what? When they say if you're — it's not an impairment — Unless. Unless there is a physiological problem. Exactly. And as we pointed out, that leads to very arbitrary — It just doesn't say that. Yeah. Our guidance doesn't say that, and it leads to arbitrary and irrational distinctions, as we pointed out with the dwarfism example, people who — sometimes medical science doesn't know everything. So some kinds of dwarfism, there's no known cause, and some kinds there is. Now, BNF says — BNSF says that's just too bad because Congress drew that line, so it's not irrational. But, no, Congress didn't draw that line. That line's not in the statute. It's not in the regulation. It's in a misinterpretation of our guidance. A better interpretation would be no distinction between people who have dwarfism, regardless of whether you know why it happened or why — or whether you don't. But if you do know, that might also be an impairment, right? So there are two options there. I think your time is up unless my colleagues have questions. So I think — Not right now.   Thank you. Thank you, Your Honor. Thank you for your argument. Now you can make your argument. Thank you, Your Honors. It may please the Court. Sean Aller on behalf of Medtronic, Incorporated. With me at council table is Brian Neal on behalf of Burlington Northern Santa Fe Railroad. We'll be splitting time. I'll take approximately eight minutes. He'll take seven minutes. What I'd like to do is address the issue of whether Mr. Valtiero was terminated because of an illegal reason and the evidence of pretext. Mr. Neal will address more of the morbid obesity. While it's an interesting issue, we think that Judge McNamee reached the right conclusion and the evidence in the records supports that Mr. Valtiero was terminated for legitimate, nondiscriminatory reasons. Let me be sure I understand this because my colleague asked your opponent about what the record showed with respect to the pretext issue. And I thought she said that the district court never got to the issue of pretext. There was an admitted falsification of the record, and that was enough, and that was done. What is your — what are you telling us about what the record says on that? The court may uphold it. That's correct. The court may uphold the dismissal of the lawsuit on this ground, even if it's not reached by a reason reached by the trial court below. And that's the Wallace case from the Ninth Circuit in 1994 and the Cornwell case from 2006. And the undisputed evidence in the case establishes that Mr. Valtiero, after he returned from his FEMLA leave, was released with a full release to work. He had no restrictions whatsoever. On December 6th, he presented a doctor's note that said he had no restrictions. He could walk. He could climb ladders. He could climb stairs. And for the next five months, his work was relatively unremarkable. In May, his supervisor, Mr. Duke, noticed that he was having — he was moving slower than usual, and he wasn't taking stairs, and Mr. Duke rightly was concerned that he wasn't completing his work. And so he looked into that. At about that time, the undisputed evidence shows that he asked Mr. Valtiero, you know, how are you doing? He says, well, I'm having trouble. And he said, I'm having trouble in one specific area, and that's climbing very tall ladders and standing on very tall ladders for long periods of time, 10 foot tall. Mr. Duke said, okay, you don't have to do that job. And every time he had a preem that assigned that kind of work, he accommodated him. Mr. Valtiero admitted that the four or five times that that came up, he went to Mr. Interjecting in all that, Mr. Valtiero had a one-week vacation that was coming up. He was assigned 12 preventive maintenance orders to do before that vacation. When Mr. Duke went into the system to check on those to see if they needed to be reassigned to other people because he might be gone, he realized that all of them had been signed off within a matter of hours, and based on the amount of work, the 30 to 40 hours' worth of work that Mr. Valtiero would have had to do to do those, it would have been impossible for him to do those and sign off on all of them before he left. Mr. Duke investigated with the help of human resources. They looked at it, and they determined that based on the condition of the work sites, the spiderwebs, the dirt, the old oil on these preventive maintenance orders, that he couldn't possibly have done these, and he didn't do these. So they talked to him when he came back from his vacation on June 23rd. Mr. Valtiero admitted that he had never completed any of the work on any of those 12 PMs. He was suspended. An independent investigation was started by human resources, Mr. Enderle. Mr. Enderle looked into it, and then Mr. Enderle again interviewed Mr. Valtiero on June 26th. On June 26th, Mr. Valtiero again reiterated he had not done those. He didn't say that other people had done those in that instance. What he did say is the first time I'm disabled, I can't climb stairs and I can't climb ladders, which would have been directly contrary to his job description. His job description, which is in the record, establishes that he's required to be able to climb stairs, and it's at the supplemental record, 629. Must be able to climb ladders, walk, bend, stoop, and kneel for up to 10 hours. This is a physical job. The Tempe facility is large, and what they do is they manufacture integrated circuits for medical devices that are implanted in individuals, heart valves, pacemakers, things of that nature. And this preventative maintenance is subject to FDA approval and audit. So, Mr. Chair, I understand your comment. You're saying that the plaintiff returned from an earlier vacation, I guess it was a medical leave. His doctor said he could come back with no restrictions. Yes, sir. So he works along. His work description from the beginning involved climbing ladders and all the kinds of things we're talking about. This was not a new thing. This was something he was required to do all along. Although his supervisor accommodated him from time to time when he would ask that, it was clearly not required that he do so from your perspective, right? He then goes on vacation. He's given an assignment.  He admits he falsifies the record. Then thereafter, when he is about to be fired, he says for the first time he has a disability and he's making a claim. Is that correct? Yes. Yes, Your Honor. Mr. Duke had talked to Mr. Valtierra. They knew each other for years. He knew what kind of work pace he worked at. All of the gentlemen who were facility maintenance technicians were large men. They were. In the record, Mr. Majors, who was quoted, was 285 pounds. So he knew what kind of work pace that Mr. Valtierra worked at. And so he could gauge that. And there had never been a comment, according to Mr. Valtierra, never a comment, a disparaging comment about his weight or about anything about his obesity or anything like that during the entire time that he worked at Mr. Duke. So there were no negative comments. Every time Mr. Duke was asked to accommodate him having to work on tall ladders, Mr. Duke accommodated that. The evidence, and I think it's important to look at the record of the commitment And this may be my confusion. After the district court, either before or after the district court decided that the real reason for the termination was the falsification of records, did the plaintiff say to the judge, please reconsider because you haven't considered pretext? They did not. They didn't file a motion for reconsideration. But is that the ground on which the district court decided the case? No. The district court decided the case on morbid obesity. Right. And so the other side is saying the district court never reached a question of the actual cause of the termination, and I'm not sure where we are with that. That if we disagree with the district court's determination on the morbid obesity, you're saying we should do what? You can review the record de novo, as you do in summary judgment motions. There's evidence supporting the legitimate nondiscriminatory reason. That's unrebutted. So from your perspective, we can perform a McDonnell-Douglas analysis ourselves and affirm. Yes, Your Honor. Well, but your adversary says, no, that's not true because the district court never reached it, and we never had a chance to argue it, and it's just not in the case. According to the ---- Looking at what the district court did, that seems to be true. Did you argue this? Was this before the district court? Absolutely, Your Honor. It was argued by both sides at the district court level, and it's fully briefed. With that, I'd like to reserve the rest of my time for Mr. Neal. Okay. Very well. Good morning. Good morning, Your Honors. May it please the Court. I'm Brian Neal here representing BNSF Railway, appearing as amicus. Thank you for allowing me time to speak to you today. As Mr. Ahler said, I'll be talking about the obesity as an impairment issue, which, as the parties have said, you may or may not decide that you need to reach. If you do reach that issue, we are asking that the Court adopt the same rule that's been adopted by four other circuits and an overwhelming number of district courts, which, enjoined by the Seventh Circuit just a couple of days ago ---- But it doesn't seem to be supported by the language. It is absolutely supported by the language. The ---- and we're talking about the language of the guidance you're asking me about. Uh-huh.  The issue about how to read that guidance is one problem is that the EOC comes in as an amicus and argues this is what we meant in our guidance, and a number of courts have said otherwise. But the agency has never gone back and revised the guidance. And the phrase that they point to where the word or is used, and they say, excuse me, they say that it should be, they say that it should, it means that the weight that is outside the normal range is enough without being a physiological disorder. Well, from a grammatical perspective, that's not right because we're talking about something that's describing the negative. And the dissenting opinion in the Montana Supreme Court case, which did adopt that view, explains that and walks through it. But what the other courts have done, and two other courts, Seventh and Eighth, have rejected that and said no, when you read it as a whole, the better reading is you have to have both outside the normal range, you know, and an underlying physiological disorder. And one reason for that is if you go beyond that one sentence that we're talking about and look at the rest of the conditions such as pregnancy that are not the result of a physiological disorder are not impairments. And it doesn't include personality traits that are not the result of physiological disorders. And so what the agency was doing is taking situations where someone might argue that something that looks like an impairment or maybe argued to be an impairment and explaining why they are not. And so they are not unless outside the normal range. Counsel, what do we do, as you know, the EEOC now takes the position that its guidance means a particular thing. As you know, there's something called our deference where they construe their own regulation. Why shouldn't we defer to the agency's construction of its own guidance in this case? Assuming our deference surprised the Court. No, I understand. I understand the Supreme Court may not agree with our deference anymore. But for the moment, it's still there. So what do we do with that? So there are two reasons to reject. And at the outset, I'll say three other circuits have already reached this conclusion. It rejected the EEOC's reading as amicus, which is different from what the agency has done as a policymaking body. And that first issue is the main reason to reject, because you reject our deference if there's a reason to question whether the statement in the amicus brief is the considered view of the agency. And what I mentioned earlier, that the EEOC over all these years with all these cases has never come in and done anything to the guidance or to the regulation. It could have done it at any time. It completely revamped the regulations after the 2008 amendments, and it still didn't do anything on this point. So you've got the policymaking group over here that's not taking steps to line up the language and the guidance and the regulation with the arguments that its lawyers in the litigation division are out there making in these cases. That's one of the reasons. I know the EEOC said that in one of the cases there was a public agency involved, so they weren't involved. But were they involved in the other court decisions?  Yes. They were a party in the Sixth Circuit case. They appealed as an amicus in the Morris case, the Eighth Circuit case. And in the Seventh Circuit case, the newest one, although they did not appear, the plaintiff there argued based on the EEOC's amicus briefs. And so the court of appeals, in fact, did address that in footnote 5 on page 14 of the slip opinion. And it, too, rejected the idea of our deference to the agency's position. The second reason to reject our deference goes to inconsistency in the position. And so even though the EEOC has, it is true, filed, I think, four amicus briefs where it has said morbid obesity is an impairment, it has defined morbid obesity strikingly differently in those cases. And so what we have now is they're the norm standard, which relates to, that was the standard first stated in the EEOC compliance manual, which was actually an issue in that Montana case, the fight case, which came to this court because it was there on a certified question. And Judge Schroeder was on the panel that reviewed that decision and looked at the compliance manual standard, that 100 percent over the norm standard, as the, what put some parameters around the normal range concept. Now, back to the our deference point, that inconsistency, some cases they argue 100 percent over the norm, some cases they argue BMI 40, those are very, very different standards. Someone with BMI 40 is not doing the agency as to the amicus brief that they file. It may be due the agency currently as to the guidance itself, which is another problem. They're doing a double dip here. It's amicus brief to guidance to regulation. Well, I'm trying to understand what this means, though. So if obesity is not, if you're correct and the Eighth Circuit is correct and these cases are correct, and it's not a physical, it's not an impairment unless it is a physiological disorder or caused by a physiological disorder. What kind of physiological disorder would that be? Because we don't really know why people are, have, some people tend to be fatter than others. Right. So the core problem with the argument about obesity is that obesity means excess weight. Weight is a characteristic just like eye color or hair color. And the argument is that when you get excess weight at a certain point, it starts to be labeled as something, but that doesn't change its fundamental characteristic as a characteristic. And only when there's an underlying physiological disorder, and those are fairly rare. There are some disorders that cause obesity. There may be some medications that are taken for other conditions that cause obesity. Those are pretty rare situations. You mentioned pregnancy a few minutes ago. I don't know whether this exactly fits, but how would pregnancy, a normal pregnancy, qualify as an impairment if it weren't tied to a physiological, something really unusual that made it so that there was an imminent loss of losing the baby or something like that? It would not. And for really the same reason. Pregnancy is a normal functioning of the body, just like characteristics are normal aspects of the body. And so unless you had, you can't have someone who has, who is pregnant, of course, who develops other conditions, and those other conditions may be treated as impairments depending on what they are. And, you know, that's the basic, goes to the basic argument I was making before about the guidance and how you have to look at that. Your time is over. Let me ask my colleague if either has any additional questions for you. I think not. So we thank you both for your argument. You actually ran out of time, but we're going to give you two minutes to respond for the next few minutes. Thank you, Your Honor. Thank you. Thank you, Your Honor, if I may. Weight is very different than someone's hair color or eye color. Within the normal range, they're both characteristics. I will wholeheartedly agree with that. At an excessive range, excessive weight could potentially be fatal. It can kill you. At an excessive range, your eye color is never going to kill you. I agree with your point about that, but let's get back to what was said. If I understand it, the job description of your client always included the very things that he now complains about. He was doing that for 10 years. Occasionally he would ask for something that was given to him. There were other people that had weight issues. He wasn't abused because of the weight or something like that. He doesn't ask for an accommodation. I know it's not an accommodation claim. Then he comes back, and for the first time when they found that he had falsified the records, he then says he's been discriminated against. How are we supposed to view that? Isn't that a bit, I don't know, kind of gaming the thing? Yes, and if that were the only point in the analysis where the employer had an obligation to either accommodate or be aware of Mr. Valtierra's physical limitations, that would be different. I do know that there's case law that says you can't raise the disability issue immediately after they've found out that you've engaged in misconduct or they've fired you. However, they were aware of Mr. Valtierra's morbid obesity, whether or not they knew it was a disability, whether or not they knew that they were accommodating him. But what you're saying they did wrong was his job description. So let's just say hypothetically he had a disability that he had to use a computer. Say it was a law clerk, a Ninth Circuit judge, and all of a sudden the law clerk can't use a computer. Is that a violation of the Americans with Disabilities Act because they can't do the computer? So at that point you have to engage in the interactive process and have that open dialogue about, okay, what are your limitations, and can I accommodate them without imposing undue burden on myself? Your client didn't do that until after he was accused of falsifying the record. Because the accommodations had already been awarded to him in an informal manner. So there was no problem until Wayne Duke, the supervisor, recognizes that he's having issues and said, well, I know that I had previously taken these requirements away from him. I'm going to give them back and see if he can actually do it because he's 360 pounds, and I don't think that he'll actually get to the top of the ladder. And then you find out that Mr. Duke is surprised afterwards via e-mail saying, aha, he could climb this ladder. Somehow he did get to the top of the roof. He's surpassed all of our expectations. One comment I did want to make, my apologies. Well, I think the record needs to reflect in light of that last hypothetical that law clerks always know how to use computers. It's only judges who have difficulties. Go ahead. Make your quick point, please. I think I forgot what it was. Oh, earlier I said that the court doesn't get to the pretext issue. I meant the district court. I must have misspoken. I agree with this court's review is de novo, and my apologies if I misspoke about that. No problem. Thank you all for your argument. We appreciate it. It's an interesting and difficult case. Do either of my colleagues have any additional questions? I think we're all set. Okay. Thank you for your argument. The case of Valtierra v. Medtronics is adjourned.
judges: Schroeder, M. Smith, Rakoff